2004-NMCA-126

101 P.3d 327

**Edward N. MALOOF, Plaintiff–Appellant,**

**v.**

**Mia S. PRIESKORN, Fernando and Rebecca Vigil, and Daniel and Kathy Holguin, Defendants–Appellees.**

**No. 23,901.**

Court of Appeals of New Mexico.

Aug. 4, 2004.

Certiorari Denied, No. 28,905, Nov. 3, 2004.

Edward N. Maloof, Las Vegas, NM, Pro Se Appellant.

Robin A. Goble, Thomas M. Domme, Miller Stratvert P.A., Albuquerque, NM, for Appellee Prieskorn.

Thomas A. Simons, IV, Daniel H. Friedman, Simons & Slattery, L.L.P., Santa Fe, NM, for Appellees Vigils and Holguins.

*OPINION*

PICKARD, Judge.

{1} In this appeal from two orders of summary judgment, we consider whether a reversionary clause in a 1935 deed prohibiting any use for "immoral purposes" was triggered by conduct alleged to have taken place on part of the original property, which has long since been subdivided. Appellees in this case are factually distinct. The Vigils and Holguins own property that does not involve any allegations of conduct that would trigger the reversionary clause. As to these Appellees, we hold that their properties would not be subject to forfeiture under the doctrine of partial reversion, which limits reversion to the property where the prohibited conduct took place. The other Appellee, Mia S. Prieskorn, is the owner of a mobile home park where the alleged "immoral" activities took place. Based on a strict construction of the reversionary clause and the lack of any proof that Prieskorn herself used the property in a manner that would trigger the reversionary clause, we affirm the district court to her as well.

**BACKGROUND**

{2} Plaintiff, Edward Maloof, filed a complaint for ejectment and recovery of real property based on his status as a successor-in-interest to a reversionary clause contained in a 1935 warranty deed that conveyed 71.5 acres to the City of Las Vegas, New Mexico, by Najeeb and Mentaha Maloof. The 1935 deed contains the following restriction:

> provided however that this conveyance is hereby made and the land conveyed under the following conditions: That no building now on said premises or to be erected on said land shall at any time be used for immoral purposes, or for the manufacture and/or sale of any intoxicating liquors by the grantee, its successors, heirs, and assigns, and that in the event of said condi-

tion being broken, then this deed shall become null, void, and of no effect, and all right, title and interest of, in and to the premises of said above described land hereby conveyed, shall revert to the grantor, his successors and assigns.

{3} This Court affirmed the validity of this restriction in *Prieskorn v. Maloof*, 1999–NMCA–132, 128 N.M. 226, 991 P.2d 511, based on the conclusion that it amounted to a restraint on use, as opposed to an impermissible restraint on alienation. That litigation had been initiated by a quiet title suit brought by Prieskorn, now one of the defendants in the present case, in an effort to remove the restriction. As we observed in that opinion, the original 71.5 acres was subdivided beginning in 1961 and now has a thirty-home subdivision on one end and a 204–unit mobile home park owned by Prieskorn on the other end, separated by undeveloped land. *Id.* ¶ 4. Because *Prieskorn* was limited to the narrow issue of the validity of the reversionary clause and a related changed conditions argument, we did not consider any specific allegations of prohibited use or the legal issue of whether reversion on a single parcel would cause reversion as to the entire 71.5 acre tract.

{4} In August 2001, Maloof filed a complaint that placed these issues squarely before the district court. Maloof named as defendants all of the individual owners of the subdivided properties. However, the alleged prohibited conduct occurred only on the Prieskorn property, the Enchanted Hills Mobile Home Park. Two of the Enchanted Hills residents had been convicted of trafficking cocaine, and one had been convicted of trafficking heroin, all of which was alleged to have taken place on the Prieskorn property. The complaint further alleged that some of the Enchanted Hills residents were not married, but were cohabitating together as husband and wife. Based on the drug trafficking and the cohabitation, Maloof claimed that the "immoral purposes" clause had been triggered as to the entire 71.5 acre original conveyance.

{5} Several of the individual property owners were granted summary judgment prior to the orders involved in the current appeal. In

its order granting summary judgment to defendants Carlos Gallegos, Sr., and Ronald L. Diehl, the district court noted that all of the alleged conduct took place on the Prieskorn property and that Maloof had not come forward with evidence to show that either the individual property owners or Prieskorn had knowledge of or consented to the conduct. In addition, the district court concluded that a strict interpretation of the reversionary clause limited "immoral" purposes to sexual conduct that went beyond mere cohabitation. Finally, the district court observed that its ruling effectively applied to all of the defendants except anyone who had an interest in the Prieskorn property. In other words, the district court recognized that any reversion would only occur on that part of the 71.5 acres where the alleged prohibited conduct occurred. The district court subsequently granted summary judgment to Appellees Vigils and Holguins for the same reasons that applied to Gallegos and Diehl. The district court granted summary judgment to Prieskorn without articulating a rationale in its order, but it must have ruled that the allegations against Prieskorn were insufficient to trigger the reversionary clause.

## DISCUSSION

### A. Standard of Review

{6} "Summary judgment is proper if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Roth v. Thompson*, 113 N.M. 331, 334, 825 P.2d 1241, 1244 (1992). A prima facie showing of summary judgment shifts the burden to party opposing the motion to come forward with specific material facts that would make a trial necessary. *Id.* at 334–35, 825 P.2d at 1244–45.

### B. The Doctrine of Partial Reversion

■ {7} As noted, the majority of named defendants in this case, including Appellees Vigils and Holguins, own property that was part of the original grant, but has since been severed from the property where the alleged immoral conduct took place. The district court observed that this factual distinction from the Prieskorn property supported dismissal of all the claims against these defendants. In effect, the district court applied what has been referred to as the doctrine of partial reversion. Although this Court has only considered the doctrine in a single case, the analysis and authorities cited in *Thomas v. City of Santa Fe*, 112 N.M. 456, 816 P.2d 525 (Ct.App.1991), support the legal conclusion that any reversion under the facts alleged in the complaint would apply only to the Prieskorn property.

{8} In *Thomas,* the plaintiff's predecessors had sold two large tracts to the City of Santa Fe, with language in the deed stating that the failure to use the land for airport purposes would be treated "as if this conveyance had never been made and executed." *Id.* at 457, 816 P.2d at 526 (internal quotation marks and citation omitted). In 1961, the City received approval from the plaintiffs to use part of one tract for a sewage plant. *Id.* In the mid–1980's, however, the plaintiffs had come to believe that part of the land was not being used for either airport or sewage plant purposes, and they filed suit seeking a partial reversion as to this property. *Id.* at 458, 816 P.2d at 527. In rejecting the City's contention that a blanket prohibition against partial reversions should apply, our Court in *Thomas* observed: "[a]lthough explicit authority on the question is scant, the few cases that directly address the question appear to favor partial reversion in appropriate circumstances." *Id.* at 460, 816 P.2d at 529. The guiding force behind the doctrine is the principle that reversionary language will be strictly construed so as to avoid forfeiture. *Id.; see also* 1 Joyce Palomar, *Patton and Palomar on Land Titles* § 208, at 494 (3d ed.2003) (stating that "a condition or covenant is likely to be strictly construed and any doubts resolved against the condition"). As such, conduct that affects only a portion of land that is subject to a reversionary clause will either lead to no forfeiture, or forfeiture of the affected property only. *Thomas,* 112 N.M. at 460, 816 P.2d at 529. The critical inquiry concerns the intent underlying the reversionary language in the deed. *See id.* In construing remainderman language in a deed, "[t]he current flow of decisions indicates that courts are using donative intent as the lode star for decision making, looking at the specific facts in each case rather than

applying the systematic, somewhat mechanical, rules of older courts." 3 Richard R. Powell, *Powell on Real Property* § 20.04[6], at 20–74 (Michael Allan Wolf ed., rel. 92, 2000).

{9} In *Thomas*, the requisite intent to allow partial reversion was determined to be lacking. 112 N.M. at 461, 816 P.2d at 530. There was no express language in the condition addressing the issue, the language used was too broad to allow for an implicit recognition of this possibility, and there was no extrinsic evidence of the parties' intent. *Id.* Applying a strict construction of the condition to avoid forfeiture thus led to the conclusion that no partial forfeiture would be allowed.

{10} In the present case, we have an issue that was not directly addressed in *Thomas:* whether facts that might lead to a partial forfeiture, i.e., prohibited conduct on a single tract of the original grant, could result in forfeiture of all of the properties subject to the 1935 reversionary clause. We believe that this is implicitly addressed by *Thomas* in two ways. First, the cases relied on in *Thomas* support the view that where there is a partial failure to comply with a reversionary clause, the judicial desire to avoid forfeiture will either lead to no forfeiture or will limit reversion to the affected property only. *See, e.g., Bornholdt v. S. Pac. Co.,* 327 F.2d 18, 20–21 (9th Cir.1964) (holding is similar to *Thomas* in that partial non-conforming use deemed insufficient to even trigger partial forfeiture); *Tamalpais Land & Water Co. v. Northwestern Pac. R.R.,* 73 Cal.App.2d 917, 167 P.2d 825, 832 (1946) (holding partial reversion appropriate where railroad had subdivided property); *Quatman v. McCray,* 128 Cal. 285, 60 P. 855, 856 (1900) (concluding, in considering the non-conforming use of one of appellants' two lots, "[w]e think the case is clearly one where justice and equity forbid the forfeiture beyond the lot on which the dwelling was placed"); *Marthens v. B & O R.R.,* 170 W.Va. 33, 289 S.E.2d 706, 713 (1982) (observing that some courts require non-conforming use of entire property to justify full forfeiture, but holding that doctrine of partial reversion is the better approach).

{11} Second, *Thomas* also indicates that there must be strong language that will support any forfeiture. *Thomas,* 112 N.M. at 461, 816 P.2d at 530. Here, like *Thomas,* there is no express language in the 1935 deed indicating that the grantor intended to trigger a full reversion based on conduct that only affected a single, severed parcel. The scope of the condition refers to "said premises." However, in light of our strict construction to avoid forfeiture, this language is insufficient to be read to mean that "said premises, even if subdivided into different ownership"; nor is there any extrinsic evidence that would support this interpretation. In addition, as pointed out by the Vigils and Holguins in their answer brief, the practical effect of such an interpretation would be unworkable, requiring them to either forfeit their property without any misconduct on their part or to monitor the activities of other landowners and actively seek injunctive relief to prevent forfeiture. By its very terms, the reversionary clause is punitive in nature, punishing the grantees for choosing to put the land to "immoral" use. Given this principled, character-based, stance, the grantor could not have intended to punish individuals who were acting in conformance with these stated goals. As such, we conclude that the district court properly granted summary judgment to the Vigils and Holguins because Maloof has not made any claim that they engaged in conduct on their properties that would have triggered the reversionary clause.

{12} This still requires us to consider whether a partial reversion would be allowed for the Prieskorn property, and we conclude that it can be allowed if the facts support it. Our analysis initially is similar to our consideration of the total forfeiture claim. There is no language expressly allowing for a partial reversion. Likewise, the reference to "said premises" indicates that the effect of subdivision was not even considered. However, unlike *Thomas,* where the City had retained ownership and the issue was severance in the context of a single owner's differing use, we believe that the subdivision of the property also subdivided the applicability of the reversionary clause. A similar result was reached in *Tamalpais:*

Now the defendants, by their own acts, have subdivided what otherwise was a grant of an entire area. *See Dickson v. St. Louis & K.R. Co.*, 168 Mo. 90, 67 S.W. 642 for a case emphasizing the importance of practical construction in such cases. It is the defendants who have torn up the tracks and are now using the terminal area for a use not provided for in the deed. Under such circumstances the contract is clearly divisible and has been made so by the acts of defendants.

167 P.2d at 832.

{13} To hold otherwise would likely have the effect of rendering the reversionary clause meaningless as soon as the grantee began subdividing the property, because conduct on one parcel would rarely justify full forfeiture. Our decision is intended to strike a balance between the objective of giving effect to the intent of the grantor by protecting the reversionary interest and thereby prohibiting specified use, and the obvious equity and practical considerations involved with landowners whose conduct does not offend the grantor's stated intentions.

### C. Prieskorn Property

{14} We next consider whether the reversionary clause was triggered by conduct that occurred on the Prieskorn property. There does not appear to be any dispute that some drug trafficking and cohabitation were taking place at the Enchanted Hills Mobile Home Park. We therefore turn again to the language of the condition in the 1935 deed, which prohibits any present or future buildings from being "used for immoral purposes, or for the manufacture and/or sale of any intoxicating liquors by the grantee, its successors, heirs, and assigns."

{15} Strictly construing this language to avoid forfeiture, we believe that Maloof had to show that Prieskorn herself had knowledge of and consented to the prohibited conduct. As indicated above, the condition here is character based and punitive, and therefore requires some volitional act by the landowner. It does not make sense to punish an individual for acting immorally by imputing the conduct of another in the absence of some knowledge and ratification of the con-

duct. Our interpretation is therefore compelled by the equitable factors in this case. *See Albuquerque Nat'l Bank v. Albuquerque Ranch Estates, Inc.*, 99 N.M. 95, 102, 654 P.2d 548, 555 (1982) (noting that forfeiture will be allowed only after equitable factors of the case have been considered).

{16} Based on this reading of the condition, the drug trafficking basis for reversion may be easily dismissed. Although Maloof claimed that the evidence might show that Prieskorn knew of and somehow condoned this activity, this is insufficient to defeat summary judgment. *See Dow v. Chilili Coop. Ass'n*, 105 N.M. 52, 54–55, 728 P.2d 462, 464–65 (1986) (stating that summary judgment is not refuted by simply arguing that there are evidentiary facts requiring trial). To the contrary, the record reflects that the drug activity was stopped when it was discovered, and the residents who were engaged in the activity were no longer tenants at Enchanted Hills. Again, simply because someone has acted in an "immoral" fashion on one's property should not be sufficient to trigger the reversion. Otherwise, theoretically, a remainderman under the 1935 deed could trigger the reversion by monitoring the property for any immoral activity by a third party. In the absence of any showing that Prieskorn had knowledge of and to some degree condoned, encouraged, or ratified the drug trafficking, this basis does not serve to trigger reversion, even assuming that drug trafficking is immoral, a questionable assumption in light of the authorities cited below.

{17} The cohabitation ground is somewhat more complicated. Because the history of this litigation shows that it is unlikely to end with this case, we deem it prudent to decide the issue even if Prieskorn may have been unaware that some of her tenants were cohabiting. If we were to decide the issue on grounds of lack of knowledge, it is likely that a new suit would be filed, demonstrating the knowledge that Prieskorn acquired during this suit.

{18} We therefore need to turn again to the language of the deed. The phrase "immoral purposes" is probably a reference to

impermissible sexual activity. The phrase had been used in the original enactment of the Mann Act. *See* 18 U.S.C. § 2421 (Amendments), which prohibited the interstate transportation of "any woman or girl for the purpose of prostitution or debauchery, or for any other immoral purpose." *See generally* 63C Am.Jur.2d *Prostitution* §§ 31–40 (1997) (discussing the Mann Act). The Supreme Court interpreted the Mann Act language to require transportation for an unlawful purpose involving sexual intercourse. *See Hansen v. Haff,* 291 U.S. 559, 563, 54 S.Ct. 494, 78 L.Ed. 968 (1934). The phrase also found its way into deed restrictions simultaneously prohibiting the sale of liquor and use of property for "immoral purposes." *See, e.g., Mason v. Farmer,* 80 N.M. 354, 355, 456 P.2d 187, 188 (1969). A host of cases confirms that immoral purposes generally connotes illegal sexual activity, such as prostitution and sexual relations with minors. *See, e.g., Bernson v. Bowman,* 182 Cal.App.2d 697, 6 Cal. Rptr. 455, 457 (1960) (involving sale of property with representation that it was not used for immoral purposes when it was in fact used for prostitution); *Ron's Last Chance, Inc. v. Liquor Control Comm'n,* 124 Mich. App. 179, 333 N.W.2d 502, 504 (1983) (stating that "[a]ny person of ordinary intelligence would reasonably believe that a prohibition against 'solicitation for immoral purposes' is intended to prohibit solicitation for prostitution"); *C.J.C. v. Corp. of Catholic Bishop of Yakima,* 138 Wash.2d 699, 985 P.2d 262, 270 (1999) (en banc) (holding that immoral purposes include sexual activity with children).

{19} It is possible, if not probable, that Najeeb and Mentaha Maloof believed that cohabitation was immoral. However, because of the potential forfeiture, we must construe the deed strictly against the grantors. A strict interpretation of the deed and consideration of equitable principles leads to the conclusion that the reversionary clause was not triggered. First, mere cohabitation is not in the same category as illegal sexual activity. Indeed, cohabitation was decriminalized in this state in 2001, before Maloof filed his complaint. *See* NMSA 1978, § 30–10–2 (repealed 2001).

{20} Second, as a landlord, Prieskorn has a legal obligation to "treat all persons equally in evaluating credit or renting or leasing available space, except that all or any portion of a park may be designated for adult-only occupancy." NMSA 1978, § 47–10–11(E) (1997). Under the Human Rights Act, Prieskorn was prohibited from discriminating on the basis of spousal affiliation or sexual orientation. NMSA 1978, § 28–1–7(G)(1) (2003). Therefore, applying a strict construction to avoid forfeiture and mindful of the equities of Prieskorn's position, we conclude that she was not "using" the property for an immoral purpose when renting to cohabiting couples, but was simply complying with the law and not acting in a discriminatory fashion. As a result, the district court properly granted summary judgment to her as well.

## CONCLUSION

{21} For the reasons set forth above, we affirm the orders of summary judgment.

{22} **IT IS SO ORDERED.**

WE CONCUR: CYNTHIA A. FRY and MICHAEL E. VIGIL, Judges.